UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ANTHONY W. GREEN**,                    Case No. 1:13 CV 2356

        Plaintiff,                    Magistrate Judge James R. Knepp II

   v.                    MEMORANDUM OPINION AND
                                         ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

## INTRODUCTION

Plaintiff Anthony Green filed a Complaint against Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On November 4, 2009, Plaintiff filed for DIB alleging a disability onset date of July 13, 2007. (Tr. 255-61). Plaintiff's claim was denied initially (Tr. 120) and on reconsideration (Tr. 121).  Plaintiff then requested a hearing from an administrative law judge ("ALJ"). (Tr. 158). On June 7, 2011, Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before an ALJ, after which Plaintiff was found to have been disabled since his alleged onset date. (Tr. 122-35).

On November 21, 2011, the Appeals Council decided, on its own motion, to review the decision of the ALJ because the hearing decision did "not contain an adequate residual functional

capacity assessment that cites and discusses medical evidence in the record supporting the assessed limitations on a function-by-function basis." (Tr. 207-12). On January 28, 2013, a second hearing was held before a different ALJ, at which Plaintiff (represented by counsel) and a VE testified. (Tr. 44-86). Following this hearing, the ALJ found Plaintiff not disabled. (Tr. 17-40). On September 16, 2013, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981.

## FACTUAL BACKGROUND

### Vocational and Personal Background

Born on November 27, 1956, Plaintiff was 54 years old at the time of his date last insured. (Tr. 32). Plaintiff completed the 12th grade and has previous work experience as a general laborer, machine operator, mail handler, paint mixer, and telemarketer. (Tr. 306, 310). Plaintiff alleges disability due to a workplace injury to his right wrist on July 13, 2007, combined with sciatic nerve damage and high blood pressure. (Tr. 305). Plaintiff has not worked since his wrist injury. (Tr. 305).

After leaving his ex-wife's home where he was living following his injury, Plaintiff lived alone. (Tr. 61, 346). He reported limitations in his activities of daily living, such as difficulty getting dressed and cooking for himself. (Tr. 358). He also stated that his sister did his grocery shopping. (Tr. 346, 358).

### Medical Evidence

An x-ray of the right thumb on July 13, 2007, revealed arthrosis at the first carpometacarpal joint. (Tr. 528). Examination in the days that followed revealed swelling of the thumb, wrist pain, and a decreased range of motion in the wrist and thumb. (Tr. 519, 525).

On August 24, 2007, Plaintiff was examined by Curtis Smith, M.D. Dr. Smith removed Plaintiff's thumb splint which revealed swelling and tenderness over the first dorsal compartment. (Tr. 531). The snuff box[1] of the right wrist was also swollen and Plaintiff had a limited range of motion in both his thumb and wrist. (Tr. 531). Plaintiff was diagnosed with a fracture of the right carpal navicular, laceration of the right thumb, and crush injury to the wrist. (Tr. 531-32).

An MRI of the right wrist on September 7, 2007, revealed post traumatic tears of the scapholunate ligament and triangular fibrocartilage; and tenosynovitis of the flexor pollicis longus and flexor carpi ulnaris tendons. (Tr. 534). An MRI of the right hand on September 13, 2007, revealed slight deformity and a moderate sized intra-articular effusion in the metacarpophalangeal joint of the thumb. (Tr. 535). An independent medical evaluation performed for the Bureau of Workers' Compensation ("BWC") on December 14, 2007, revealed Plaintiff continued to have pain, no grip strength in his right hand, and a limited range of motion in his right thumb and wrist. (Tr. 507-510).

On January 14, 2008, Plaintiff saw Stanley Nahigian, M.D., who found stenosing tenovaginitis with triggering of the right thumb and ring finger. (Tr. 411). Plaintiff had an outpatient surgical procedure on February 27, 2008, to restore their functioning. (Tr. 413).

On March 11, 2008, Dr. Nahigian indicated Plaintiff's return to work date should be deferred until he completed hand therapy. (Tr. 476). He estimated Plaintiff could return to work on May 5, 2008. (Tr. 475). Dr. Nahigian indicated that Plaintiff was a candidate for vocational rehabilitation and would need encouragement to return to work because he had been out of the workforce for so long. (Tr. 475).

---

1. A triangular depression, formed between the tendons that connect the thumb to the wrist, when the thumb is abducted and extended. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 246 (31st ed. 2007).

Plaintiff received occupational therapy from April 7, 2008 until May 12, 2008. (Tr. 390-99). Plaintiff was discharged from occupational therapy on May 21, 2008, because he had only attended six out of eleven therapy sessions, had made a lack of progress towards his goals, and had questionable participation during his appointments. (Tr. 390). In a letter dated May 29, 2008 to a BWC claims examiner, Dr. Nahigian opined that due to Plaintiff's continued lack of participation in therapy and further medical follow-up, Plaintiff had reached the maximum medical improvement for his crush injury to the wrist, puncture wound of the thumb, and triggering of the thumb and index fingers. (Tr. 414).

On June 26, 2008, Plaintiff saw Fady Nageeb, M.D., for a pain management consultation. (Tr. 407). Plaintiff complained of constant pain, ten on a ten-point scale, in his right hand. (Tr. 407). Plaintiff said the pain was throbbing, aching, cramping, and burning, and interfered with social interaction, staying asleep, household chores, and sex. (Tr. 407). On examination, Plaintiff had mild limitation in hand movement but his musculoskeletal exam was otherwise normal. (Tr. 408). Dr. Nageeb concluded that Plaintiff had neuropathic pain in his right hand after trauma, which might suggest reflex sympathetic dystrophy or complex regional pain syndrome related to crush injury. (Tr. 408). He recommended three injections with stellate ganglion blocks, indicated they should consider a tunneled epidural catheter to facilitate physical therapy, and started Plaintiff on fentanyl patches for pain control. (Tr. 408).

In a letter dated June 27, 2008, Dr. Nahigian withdrew as Plaintiff's physician of record for BWC, indicating that he felt Plaintiff had reached the maximum medical improvement for his work-related conditions and he was not comfortable certifying further disability. (Tr. 554).

On July 8, 2008, physician Victor Badger took over as Plaintiff's physician of record with BWC. (Tr. 478).  Dr. Badger found Plaintiff had hand pain with reduced ability to clench,

indicated he may be able to do modified work after rehabilitation, and estimated a return to work date of September 2, 2008. (Tr. 478). On October 1, 2008, Dr. Badger indicated Plaintiff had made modest strides with his grip therapy and gave an estimated return to work date of October 6, 2008. (Tr. 479).

Plaintiff again underwent occupational therapy from August 8, 2008 until November 4, 2008 when he was discharged to continue with pain management and possibly a nerve block. (Tr. 622-27).

Plaintiff continued to present to health care providers with complaints of constant pain and physical examinations continued to reveal decreased range of motion, tenderness, and decreased grip strength in his right hand throughout 2008 and 2009. (Tr. 630, 637, 640, 643, 964, 966, 970, 971, 975, 976, 979, 984, 999). Apart from these findings, Plaintiff's medical evaluations were normal. (Tr. 630, 637, 640, 643, 964, 966, 970, 971, 975, 976, 979, 984, 999).

On June 8, 2009, Plaintiff's then treating physician Frederick Harris, M.D., completed an ability to work report for BWC in which he opined that Plaintiff had lost use of his upper right extremity and needed vocational training with left arm use. (Tr. 662).

James LaMastra, PT, DPT, performed a Functional Capacity Assessment on June 24, 2009 to determine the feasibility of vocational rehabilitation. (Tr. 722-23). During the assessment, Plaintiff demonstrated the ability to constantly walk, stoop, crouch, kneel, reach immediate and reach overhead (bilaterally), stand, and sit. (Tr. 722). Plaintiff could carry up to ten pounds frequently and occasionally lift up to 30 pounds, balance, and bi-manual handle on a frequent basis, and he could perform bi-manual fingering on an occasional basis. (Tr. 722). Plaintiff demonstrated asymmetric load bearing when completing lifting tasks due to significant guarding of his right hand. (Tr. 723). He had significant hand and grip limitations on the right

side. (Tr. 723). Mr. LaMastra opined that Plaintiff was a good vocational rehabilitation candidate overall and that he could return to work in a position where he was not required to complete maximal gripping tasks with his right hand and could self-pace all lifting and carrying activities. (Tr. 723).

On July 19, 2009, Plaintiff began job search services with VocWorks, where he made contact with employers and began attending computer classes three to four times a week. (Tr. 758-59). Plaintiff attended a job fair and appeared to be putting forth good effort in his job search. (Tr. 685).

Plaintiff continued to have the same pain complaints, symptoms and decreased range of motion throughout 2010 and 2011 and continued to be treated with prescription pain medications. (Tr. 1021-25, 1036, 1040, 1041, 1044, 1047-49, 1051-53, 1065, 1066, 1070, 1071, 1075, 1076, 1079, 1080, 1084, 1085, 1089, 1090, 1116, 1117, 1119, 1120, 1125, 1129, 1130, 1134, 1136, 1140, 1141, 1146, 1147, 1152, 1157). Plaintiff's medical evaluations were otherwise relatively normal except for the problems in his hand. (Tr. 1021-25, 1036, 1040, 1041, 1044, 1047-49, 1051-53, 1065, 1066, 1070, 1071, 1075, 1076, 1079, 1080, 1084, 1085, 1089, 1090, 1116, 1117, 1119, 1120, 1125, 1129, 1130, 1134, 1136, 1140, 1141, 1146, 1147, 1152, 1157).

On August 10, 2010, Plaintiff saw William Seitz Jr., M.D., on referral from Dr. Harris for complex problems involving his hand and wrist. (Tr. 1060). Plaintiff reported severe pain, inability to flex his fingers, and numbness and tingling in the median and ulnar nerve distributions of his hand. (Tr. 1060). This interfered with all aspects of daily living and caused depression which rendered Plaintiff significantly impaired in everything from personal hygiene to normal daily activities. (Tr. 1060). Examination revealed exquisitely positive Tinel's and Phalen's overlying the median nerve at the wrist and the ulnar nerve; nodularity; and an inability

to fully flex or extend his fingers because of tenderness directly at the A1 pulley of the thumb and all fingers. (Tr. 1060). Dr. Seitz indicated there was evidence of a contusion/compression of Plaintiff's median nerve and ulnar nerve at the level of the wrist in the carpal and Guyon canals; and evidence of traumatic tenosynovitis with marked trigger fingers when extending each of the five fingers. (Tr. 1060).

On November 22, 2011, Plaintiff returned to Dr. Seitz for a follow-up. (Tr. 1164). Dr. Seitz indicated that Plaintiff was "now basically totally disabled because of the severe pain and dysfunction secondary to his crush injury." (Tr. 1164). Dr. Seitz discussed the benefits and risks of surgical intervention, the goal of which would be to reduce pain and return him to functioning as much as possible. (Tr. 1164). Dr. Seitz told Plaintiff there were limits to what can be expected. (Tr. 1164). Plaintiff indicated he wanted to proceed with surgery. (Tr. 1164). Plaintiff had this surgery on May 4, 2012. (Tr. 1192).

**State Agency Physician Assessment**

On February 18, 2010, state agency physician Lynne Torello, MD, assessed Plaintiff's physical residual functional capacity ("RFC"). (Tr. 1006-1013). Dr. Torello reviewed Plaintiff's medical file and opined that he had the ability to lift up to twenty pounds occasionally and ten pounds frequently, could stand and/or walk or sit for six hours in an eight-hour work day, and his ability to push/pull was limited in his upper extremities. (Tr. 1007). Plaintiff could never crawl or climb ladders, ropes, or scaffolds. (Tr. 1008). He was limited in his ability to handle and finger with his right hand but had unlimited use of his left hand, and had the ability to reach in all directions including over the head. (Tr. 1009). Further, Plaintiff needed to avoid concentrated exposure to hazards. (Tr. 1010).

**VE Testimony**

At the administrative hearing, the ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who could lift twenty pounds occasionally and ten pounds frequently, could stand, walk, or sit for six hours in an eight-hour work day, could perform work that did not require climbing ladders or scaffolds and no more than frequently required balancing. (Tr. 82). The work also must require no more than frequent handling and occasional fine fingering, and should not involve commercial driving or concentrated exposure to hazards such as unprotected heights or uncovered industrial machinery. (Tr. 82). Further, the work must be limited to superficial interaction with the public or co-workers, and must be limited to low stress, defined as no more than occasional decision-making and not involving an inflexible pace such as an assembly line. (Tr. 82-83). The VE testified that such a person could perform light level work such as housekeeping cleaner, sales attendant, and mail clerk. (Tr. 84).

Next, Plaintiff's attorney asked the VE what if this hypothetical person could perform only occasional handling in addition to the occasional fine-fingering. (Tr. 84). The VE responded that Plaintiff's job options would be quite limited, one job he could perform would be usher, with about 5,000 positions in the state, 120,000 nationally, and about 300 in the local area. (Tr. 84-85).

*ALJ Decision*

On February 8, 2013, the ALJ found Plaintiff had the severe impairments of depression and residual effects of a crush injury to his right hand and wrist but that these impairments did not meet or equal a listing. (Tr. 17, 23-24). The ALJ then found Plaintiff had the RFC to perform a range of light work with the additional limitations that he could lift twenty pounds occasionally and ten pounds frequently; could stand, walk, or sit for six hours in an eight-hour workday; could

not climb ladders, ropes, or scaffolds; could do no more than frequent balancing, no more than frequent handling, and occasional fine fingering; and could not perform work that involved commercial driving, or concentrated exposure to hazards such as unprotected heights and industrial machinery. (Tr. 28). Further, Plaintiff was limited to only superficial interactions with the public or co-workers, and could only perform low stress work that had no more than occasional decision-making and did not have an inflexible pace. (Tr. 28).

Next, the ALJ found, based on the VE testimony, that Plaintiff could perform work as a housekeeping cleaner, sales attendant, and mail clerk; hence, he was not disabled. (Tr. 32-33).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred by making an RFC determination that was not supported by substantial evidence and in her analysis of Plaintiff's pain complaints. (Doc. 16, at 14-20). Further, Plaintiff argues he was denied due process because a different ALJ decided his case after it was remanded by the Appeals Council. (Doc. 16, at 20). Each of these arguments will be addressed in turn.

*RFC Determination*

Plaintiff argues the ALJ's RFC determination was not supported by substantial evidence. (Doc. 16, at 14-17). He argues the ALJ erred in determining his upper extremity limitations, particularly that he was capable of frequent handling and lifting up to ten pounds frequently and twenty pounds occasionally. (Doc. 16, at 14-17).

A claimant's RFC is an assessment of "the most he can still do despite his limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929. An ALJ must also consider and weigh medical opinions. 20 C.F.R. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. The Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Plaintiff argues the MRIs taken in 2007, as well as the physical assessments made by physicians, all indicate that he does not have use of his right hand. (Doc. 16, at 15-17). Hence, objective medical evidence supported his claims. (Doc. 16, at 15-17).

However, as the ALJ points out, despite Plaintiff's claim that he does not have use of his

11

right hand, Plaintiff was able to take computer classes three to four times a week, filled out job applications without difficulty, and actively sought employment, all of which indicated that his symptoms were not as limiting as he described. (Tr. 30, 685, 758-59).

Additionally, in a June 2009 Functional Capacity Assessment, Plaintiff's physical therapist, Mr. LaMastra, opined that although Plaintiff's upper extremity was restricted, he could perform light work, lifting up to 30 pounds frequently and ten pounds occasionally. (Tr. 29-30, 722-23) Mr. LaMastra further opined that Plaintiff was a "good vocational rehabilitation candidate" for light to medium positions provided he was not required to complete any maximal gripping tasks with his right hand and could self-pace all lifting and carrying. (Tr. 29-30, 723). This is a far stretch from having no use of his right hand.

Similarly, state agency physician, Dr. Torello opined that although Plaintiff's fingering and handling were limited, he had some use of his right hand and could lift up to ten pounds frequently and twenty pounds occasionally. (Tr. 29, 31, 1007-1009).

In sum, substantial evidence supported the ALJ's determination that Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently and he retained enough use of his arm to engage in work that requires occasional fingering and frequent handling. (Tr. 28). Therefore, the ALJ did not err in making her RFC determination.

### Plaintiff's Credibility

Next, Plaintiff argues the ALJ erred in finding Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms were not entirely credible." (Doc. 16, at 17). Specifically, Plaintiff argues the ALJ did not properly consider the location, duration, frequency, and intensity of his pain; its effect on his daily activities; the extensive medications he

had been prescribed; and that his treatment included surgery and occupational therapy. (Doc. 16, at 19-20).

An "ALJ is not required to accept a claimant's subjective complaints" and may "consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("we accord great deference to [the ALJ's] credibility determination."). The Sixth Circuit recently stated an ALJ's credibility findings are "virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, Fed App'x 508, 511 (6th Cir. 2013) (quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

With this deferential framework in mind, Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

In finding Plaintiff's pain symptoms were not as severe as described, the ALJ considered that although Plaintiff claimed to not be able to do anything with his right hand, he had not had difficulty completing job applications or otherwise attempting to secure work nor with taking computer classes. (Tr. 30, 685, 758-59).

The ALJ also considered that Plaintiff had been inconsistent with treatment and non-compliant with therapy, suggesting his symptoms were not severe enough to cause him to continually seek treatment. (Tr. 29). As the ALJ noted, Plaintiff had surgery in 2008, but then was non-compliant with his physical therapy. (Tr. 29, 390, 413). Treatment records indicate Plaintiff only received pain medication from the time he ended physical therapy in November 2008 until he received surgery and started occupational therapy again in 2012. (Tr. 30, 622-27, 1192).

Review of the ALJ's decision indicates that the ALJ did consider many of the 20 C.F.R. § 404.1529(c) factors described in Social Security Ruling 96-7p such as Plaintiff daily activities, pain medications, and the fact that tasks may worsen Plaintiff's symptoms. (Tr. 29-31). However, Plaintiff's inconsistent treatment record and apparent ability to perform some tasks with his right hand indicate his pain is not as a severe as he described. Therefore, substantial

evidence supported the ALJ's decision to give limited weight to Plaintiff's statements regarding the severity of symptoms.

***Due Process***

Finally, Plaintiff claims he was denied due process because a different ALJ decided his case after it was remanded by the Appeals Council. (Doc. 16, at 20). Plaintiff argues HALLEX[2] 1-2-1-55 requires that Appeals Council remands be assigned to the same ALJ. (Doc. 16, at 20).

The Due Process clause of the 5th Amendment guarantees that no deprivation of life, liberty, or property will occur without notice and a fair hearing. *Adams v. Massanari*, 55 Fed. Appx. 279, 286 (6th Cir. 2003) (quotations omitted). Logically, Plaintiff must first establish that the "United States [is] attempting to deprive him of a protected interest." *Flatford v. Chater*, 93 F.3d 1296, 1303 (6th Cir. 1996). Plaintiff easily satisfies this element since "a social security claimant has a property interest in benefits for which he or she hopes to qualify." *Id*. at 1304.

Next, Due Process requires that a social security hearing be 'full and fair.' *Adams*, 55 Fed. Appx. at 286 (quoting *Perales v. Richardson*, 402 U.S. 389, 402-02 (1971)). This requires the Court to consider three factors:

> [1]] the private interest that will be affected by the official action; [2]] the risk of erroneous deprivation of such interest through the procedure used, and the probable value, if any of additional or substitute procedural safeguards; [and 3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Adams*, 55 Fed. Appx. at 286; *see also Flatford*, 93 F.3d at 1306 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1996)).

---

2. The Social Security Administration's Hearings, Appeals, & Litigation Law Manual which provides procedures for its administrative hearings.

As to the first factor, Plaintiff's private interest is in a fair determination of his qualification (or lack thereof) for Social Security disability benefits and a meaningful opportunity to present his case. *Adams*, 55 Fed. Appx. at 286.

As to the second factor, Plaintiff argues the ALJ's failure to follow the procedures set in HALLEX denied him a full, fair hearing. However, this argument fails.

The agency procedures set forth in HALLEX may embody, but do not *create* federal due process rights for claimants. *Dukes v. Comm'r of Soc. Sec.*, 2011 WL 4374557, *9 (W.D. Mich 2011) (quotations omitted). A court may certainly find that a procedure provides a plaintiff with due process. However, failure to apply a procedure which is not the embodiment of a Constitutional right does not deprive a claimant of federal due process rights. *Id*. In fact, the Sixth Circuit has held that HALLEX is merely non-binding administrative guidance which is generally not enforceable on appeal through the courts. *Bowie v. Comm'r of Soc. Sec.*, 539 F. 3d 395, 399 (6th Cir. 2008).

HALLEX 1-2-1-55 provides, in pertinent part, that for a non-court Appeals Council remand, the case is assigned to the same ALJ who issued the decision unless: "[(1)] the case was previously assigned to that ALJ on a prior remand from the [Appeals Council] and the ALJ's decision or dismissal after remand is the subject of the new [Appeals Council] remand; or [(2)] the [Appeals Council] directs that the case be assigned to a different ALJ."

From this, it is clear that whether to remand a case to the same ALJ is a decision left to the Appeals Council's sound discretion. Although Plaintiff argues error occurred because the Appeals Council had not directed that his case be heard by a different ALJ, the Appeals Council had the opportunity to reverse on these grounds and declined to do so. (Tr. 1-7). Because this

16

decision was entirely within the discretion of the Appeals Council, Plaintiff's claim that his due process rights were violated because his case was remanded to a different ALJ is without merit.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge